UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DANIEL BERRY,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

    Defendant.

CASE NO. C08-5149FDB-KLS

REPORT AND RECOMMENDATION

Noted for February 20, 2009

Plaintiff, Daniel Berry, has brought this matter for judicial review of the denial of his application for disability insurance benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by <u>Mathews, Secretary of H.E.W. v. Weber</u>, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Court's review.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

Plaintiff currently is 49 years old.[1] Tr. 26. He has a high school education and past work experience as a courier. Tr. 23, 102, 110, 495.

On September 9, 2005, plaintiff filed an application for disability insurance benefits, alleging disability as of June 10, 2000, due to back problems, type 2 diabetes, loss of mobility in his knees,

---

[1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

depression, and sleep apnea. Tr. 12, 66-68, 101. His application was denied initially and on reconsideration. Tr. 26-27, 58, 61. A hearing was held before an administrative law judge ("ALJ") on July 26, 2007, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 491-523.

On September 12, 2007, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1) at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2) at step two, plaintiff had a "severe" impairment consisting of lower back pain;

(3) at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4) after step three but before step four, plaintiff had the residual functional capacity to light work, with certain other non-exertional limitations; and

(5) at step four, plaintiff was capable of performing his past relevant work.

Tr. 12-24. Plaintiff's request for review was denied by the Appeals Council on February 15, 2008, making the ALJ's decision the Commissioner's final decision. Tr. 4; 20 C.F.R. § 404.981.

On March 13, 2008, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3). The administrative record was filed with the Court on June 6, 2008. (Dkt. #11). Plaintiff argues the ALJ's decision should be reversed and remanded to the Commissioner for an award of benefits or, in the alternative, for further administrative proceedings for the following reasons:

(a) the ALJ erred in failing to take into account plaintiff's inability to qualify for his past relevant work due to use of narcotic pain medication;

(b) the ALJ improperly limited cross examination of the vocational expert at the hearing;

(c) the ALJ erred in assessing plaintiff's credibility;

(d) the ALJ erred in failing to give proper consideration to a decision issued by the United States Department of Veterans Affairs ("VA") determining plaintiff to be entitled to individual unemployability; and

(e) the hypothetical question the ALJ posed to the vocational expert at the hearing did not include all of plaintiff's limitations.

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

REPORT AND RECOMMENDATION
Page - 2

For the reasons set forth below, the undersigned disagrees that the ALJ erred in determining plaintiff to be not disabled, and therefore recommends the ALJ's decision be affirmed. Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I. <u>The ALJ Properly Found Plaintiff to Be Capable of Performing Her Past Relevant Work</u>

As noted above, the ALJ found plaintiff could perform his past relevant work as a courier. Tr. 23. Plaintiff argues this finding is flawed, because the ALJ failed to take into consideration that to qualify as a commercial courier driver, he would have to pass a drug test as a condition of employment, and he cannot do so due to the Methadone and Percocet he takes. The ability to pass such a test, plaintiff further argues, is not an employer hiring practice as the ALJ found (see id.), but rather is a state statutory requirement for employment as a commercial courier driver and, as such, is an occupational requirement that should have been considered by the ALJ here. The undersigned disagrees.

Plaintiff testified at the hearing that "with the level of pain medications" he was taking, it was his understanding that he "would be unable to pass any kind of drug test" if he was "to attempt to return to work as a driver." Tr. 498. Plaintiff argues that to work as a courier driver in the State of Washington, he must possess a valid commercial driver's license ("CDL"), which authorizes the individual to whom the CDL is issued "to drive a class of commercial motor vehicle." RCW 46.25.010(3). A commercial vehicle is a "motor vehicle . . . used in commerce to transport passengers or property," if it is of a certain weight, "[i]s designed to transport sixteen or more passengers, including the driver," is used to transport hazardous

REPORT AND RECOMMENDATION
Page - 3

materials, or is a school bus. RCW 46.25.010(6). In Washington, "[d]rivers of commercial motor vehicles" are required to "obtain a commercial driver's license."[3] RCW 46.25.050(1). Plaintiff asserts that one of the CDL requirements Washington imposes on persons who possess a CDL, is that such persons must take and pass a drug test. See RCW 46.25.125.

There is no evidence in the record, however, that plaintiff was required by his past employer to pass a drug test – or possess a CDL – when he was working as a courier driver. Nor is there any evidence in the record that, despite his belief to the contrary, plaintiff would be unable to pass a drug test, if one were to be administered to him.[4] More importantly, though, the ability of plaintiff to get or keep a commercial driver's license – or a license of any other kind for that matter – does not appear to be the kind of factor the ALJ was required to take into consideration in determining not only his ability to perform his past relevant work at step four of the sequential disability evaluation process, but also his ability to perform other jobs existing in significant numbers in the national economy at step five thereof. Under the Commissioner's regulations, if a disability determination "cannot be made on the basis of medical factors alone," the ALJ must identify the claimant's "functional limitations and restrictions," and then assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.

A claimant's residual functional capacity ("RFC") assessment is used at step four of the sequential disability evaluation process to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or her limitations." Id. A claimant's RFC is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. Plaintiff has the burden at step four to show that he is unable to return to his past relevant work, while at step five it is the ALJ who must show there are a significant number of jobs in the national economy he can do. Tackett

---

[3] More specifically, "[e]xcept when driving under a commercial driver's instruction permit and a valid automobile or classified license and accompanied by the holder of a commercial driver's license valid for the vehicle being driven, no person may drive a commercial motor vehicle unless the person is in immediate possession of a commercial driver's license." Id.

[4] In addition, because, as discussed in further detail below, the ALJ did not err in discounting plaintiff's credibility in this case, the ALJ was not under any obligation to belief plaintiff's testimony that it was his understanding he would not be able to pass any kind of drug test, given the amount of medication he was taking for his pain.

REPORT AND RECOMMENDATION
Page - 4

v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e).

At step four, the Commissioner considers both the claimant's residual functional capacity and his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Specifically, the claimant's RFC is compared with "the physical and mental demands" of his or her past relevant work. 20 C.F.R. § 404.1520(f). No mention is made of any other factor the ALJ must consider at this step. The residual functional capacity assessment, as discussed above, focuses solely on the claimant's functional limitations and restrictions stemming from his or her physical and/or mental impairments, and the effect those limitations and restrictions have on the claimant's capacities for work-related activities. In addition, while it may be that plaintiff's past work as a courier driver in the State of Washington required him to have a CDL, that requirement does not constitute a "physical and mental" demand of the job.

The Dictionary of Occupational Titles ("DOT") describes the tasks involved in performing the job of courier as follows:

> Delivers messages, telegrams, documents, packages, and other items to business establishments and private homes, traveling on foot or by bicycle, motorcycle, automobile, or public conveyance. May keep log of items received and delivered. May obtain receipts or payment for articles delivered. May service vehicle driven, such as checking fluid levels and replenishing fuel. May be designated according to item delivered, as Telegram Messenger (tel. & tel.).

DOT 230.633-010. The DOT then goes on to set forth the strength, general educational and other relevant vocational requirements an individual must have to perform that job. Id. None of those requirements refer to or mention the need for a driver's license, commercial or otherwise.

Plaintiff asks this Court to find that the possession of a CDL is an additional *bona fide* qualification for the job of courier driver the ALJ was required to consider. In support of this request, plaintiff argues there are parallels with other occupations, where he asserts individuals must meet *bona fide* job-related qualifications that go beyond the DOT's descriptions of those occupations.[5] The Commissioner uses the DOT and "its companion publication," the Selected Characteristics of Occupations Defined in the Revised

---

[5] Actually, plaintiff provides only one example of such a parallel, the federal regulatory imposition of an age limitation for commercial airline pilots. Plaintiff, however, incorrectly cites to the Federal Circuit's decision in Professional Pilots Federation v. Federal Aviation Administration, 118 F.3d 758 (D.C. Cir. 1997), as support for the proposition that the commercial pilot age limitation is recognized as a *bona fide* occupational qualification. See id. at 763 (expressly stating that because Age Discrimination in Employment Act ("ADEA") did not limit Federal Aviation Administration's ("FAA") authority to prescribe mandatory retirement age for pilots, question of whether FAA's age limitation rule constituted *bona fide* occupational qualification within meaning of ADEA need not be reached).

REPORT AND RECOMMENDATION
Page - 5

Dictionary of Occupational Titles ("SCO"), at both steps four and five, and relies "primarily on" those publications "for information about the requirements of work in the national economy." SSR 00-4p, 2000 WL 1898704 *2; see also Massachi v. Astrue, 486 F.3d 1149, 1153 (9th Cir. 2007) (citing and quoting same). Thus, while the ALJ is not bound by the information contain therein, they are the primary sources of vocational information at these steps.[6]

The occupational, or work-related, characteristics the ALJ may consider at step four, furthermore, are, again as discussed above, limited to the "physical and mental" demands of the past relevant work. 20 C.F.R. § 404.1520(f). The requirement that a driver be in the possession of a commercial driver's license to drive a commercial motor vehicle in the State of Washington, simply does not constitute a physical or mental demand of the job of courier driver as described in the DOT. To a certain extent it could be argued that because plaintiff takes Methadone and Percocet for treatment of his pain – two medications which at would seem to fall within the definition of the term "drugs" under the Washington statutory scheme – the inability to get a CDL or a future revocation thereof, is a physically-related limitation preventing him from being able to maintain a courier driver job. See RCW 46.25.010; 49 C.F.R. § 40.3.

Such reasoning, however, is flawed. Once more, the focus at step four – and, indeed, step five – of the sequential disability evaluation process is on those work-related tasks which have been impacted by a claimant's physical and/or mental limitations. In this case, though, the substantial medical evidence in the record, as explained below, reveals that plaintiff does not suffer from any side-effects or other medication-related symptoms which would impact his ability to perform the actual physical or mental demands of the job of courier driver. That his prescription medications could at some point cause him to not be able to obtain a CDL, or to later have it revoked, and thus lose his job because testing shows those medications to be present in his system, is not the kind of work-related (i.e., physical or mental) limitation or restriction the Social Security regulations contemplate here.[7]

---

[6] The one exception to the emphasis placed on the DOT and its companion publication, the SCO, would appear to be when an ALJ makes a determination at step four that the claimant can perform his or her past relevant work "as he or she actually performed it." SSR 96-8p, 1996 WL 374184 *1; see also Pinto v. Massanari, 249 F.3d 840, 845 (9th Cir. 2001) (to find claimant not disabled at step four, ALJ must find he or she is able to perform actual functional demands and duties of his or her particular past relevant job, or those of that job as generally required by employers throughout national economy).

[7] Although plaintiff appears to limit his argument to the ALJ's findings regarding his ability to perform his past relevant work at step four here (not surprisingly given that the ALJ ended his analysis at this step after finding plaintiff capable of performing that work), the undersigned notes that the ALJ similarly would not be required to consider the CDL licensing requirement at step

REPORT AND RECOMMENDATION
Page - 6

1  II.     The ALJ Did Not Improperly Limit Questioning of the Vocational Expert

2        At the hearing, plaintiff's counsel attempted to question the vocational expert about drug testing

3  requirements in the work place. See Tr. 520-22. The ALJ prevented plaintiff's counsel from pursuing that

4  line of inquiry, however, on the basis that the Commissioner's regulations did not say anything about drug

5  testing, and thus that issue was not material to question of whether plaintiff could perform his past relevant

6  work. Tr. 521. Rather, the ALJ went on, the only thing, as fare as he knew, those regulations required of

7  him, was to look at the DOT and ask the vocational expert if his testimony was consistent with the job

8  information contained therein. Id.

9        Plaintiff argues that in preventing cross examination of the vocational expert on the issue of drug

10 testing, the ALJ abused his discretion. Again, the undersigned disagrees. Plaintiff relies on two cases,

11 Richardson v. Perales, 403 U.S. 389 (1971), and Solis v. Schweiker, 719 F.2d 301 (9th Cir. 1983), to

12 support his contention here. Those cases, however, are distinguishable from the one at hand. In Perales,

13 the Supreme Court held as follows:

> We conclude that a written report by a licensed physician who has examined the
> claimant and who sets forth in his report his medical findings in his area of competence
> may be received as evidence in a disability hearing and, despite its hearsay character
> and an absence of cross-examination, and despite the presence of opposing direct
> medical testimony and testimony by the claimant himself, may constitute substantial
> evidence supportive of a finding by the hearing examiner adverse to the claimant, when
> the claimant has not exercised his right to subpoena the reporting physician and thereby
> provide himself with the opportunity for cross-examination of the physician.

402 U.S. at 402. In Solis, the Ninth Circuit, citing to Perales, held that where a physician "is a crucial

witness whose findings substantially contradict the other medical testimony, and when . . . interrogatories

are an inadequate substitute for cross-examination," a claimant is "denied procedural due process if his

request to subpoena the physician is not granted." 719 F.2d at 301-02.

        Plaintiff asserts that had cross examination of the vocational expert been allowed here, undoubtedly

---

five as well. If a claimant is found incapable of performing his or her past relevant work at step four, at step five the ALJ considers "the same residual functional capacity assessment" considered at step four, together with the claimant's "vocational factors" – which consist of the claimant's "age, education and work experience" – to determine if an adjustment can be made to other work. 20 C.F.R. 404.1520(g)(1). Nothing in the Commissioner's regulations discussing those additional vocational factors indicates consideration of any governmental licensing requirements is relevant or required in order for the ALJ to conduct a proper disability determination at step five. See 20 C.F.R. §§ 404.1563-.1565, .1568. In addition, in determining whether a claimant is capable of performing other work existing in the national economy, the Commissioner does not consider whether the claimant actually is able to get work or be hired, whether there is a lack of work in the claimant's local area, what the hiring practices of employers are, or whether there are any job openings. 20 C.F.R. § 404.1566(a) and (c). As such, the fact that a failed or refused drug test might result in the inability to get or revocation of his commercial driver's licence, and thereby prevent him from obtaining or maintaining work as a courier driver, is irrelevant to the disability determination conducted at step five as well.

1  it would have disclosed that he could no longer work as a courier driver, as he would be unable to secure a
2  CDL, one of that job's conditions. As discussed above, though, there is no evidence in the record that
3  plaintiff was required by his past employer to pass a drug test or to possess a CDL when he was working as
4  a courier driver, or that, despite his belief to the contrary, he would be unable to pass a drug test if he were
5  to be administered one. Even then, and more importantly, this issue, also as discussed above, is irrelevant
6  to the analysis the ALJ conducts at step four of the sequential disability evaluation process, because
7  possessing a CDL does not constitute a physical or mental work-related restriction or limitation or a
8  physical or mental demand of the job of courier driver, nor is it relevant at step five, as it is not one of the
9  other vocational factors required to be considered at that step.

10  As such, plaintiff's reliance on <u>Perales</u> and <u>Solis</u> is misplaced. In both cases, the medical opinion
11  evidence at issue constituted significant probative evidence that bore directly on the medical condition of
12  the claimant, and thus was an integral part of the disability determination process requiring full opportunity
13  on the part of the claimant to examine that evidence. While certainly it would have been within the ALJ's
14  discretion in this case to allow plaintiff to cross examine the vocational expert on the issue of drug testing
15  as a condition of employment for the courier driver job, it was not an abuse of discretion to decline to do so
16  for the reasons set forth above. Accordingly, the ALJ did not err here.

17  III.    <u>The ALJ Did Not Err in Discounting Plaintiff's Credibility</u>

18  Questions of credibility are solely within the control of the ALJ. <u>Sample v. Schweiker</u>, 694 F.2d
19  639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. <u>Allen</u>, 749
20  F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is
21  based on contradictory or ambiguous evidence. <u>Id.</u> at 579. That some of the reasons for discrediting a
22  claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as
23  long as that determination is supported by substantial evidence. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148
24  (9th Cir. 2001).

25  To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the
26  disbelief." <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify
27  what testimony is not credible and what evidence undermines the claimant's complaints." <u>Id.</u>; <u>Dodrill v.</u>
28  <u>Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering,

the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." <u>Lester</u>, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. <u>O'Donnell v. Barnhart</u>, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. <u>Id.</u>

To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. <u>Smolen</u>, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." <u>Id.</u> at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." <u>Id.</u> In regard to plaintiff's daily activities, the ALJ found as follows:

> . . . Despite alleging disabling physical limitations and difficulties with concentration, the claimant has reported activities that suggest greater functional capability. For instance, in August 2000, he stated that he tried to walk one mile per day (Exhibit 6F/181). In February 2001, he stated that "I should get a job. I need the money." He reported wanting to return to school to update his skills in telecommunications and computers and that, if he were unsuccessful, he wanted to return to driving again. He disclosed that he visited the hospital for appointments, spent time on the computer, had a few local friends in his apartment complex, watched DVDs on the weekends, and baby sat for a neighbor from 3:30 PM to 8:30 PM on Tuesday, Wednesday, Thursday, and Friday (Exhibit 6F/176). Later that month, he stated that "I am getting out a little bit more socially" and that "I walk to the breakfast place," which was about three blocks from his place. He also reported that he was assuming some responsibilities managing the apartment complex (Exhibit 6F/174). In August 2001, he stated that he walked one to one-and-a-half miles during two days out of the week (Exhibit 6F/159). In September 2001, he reported that he got together with "other night owls like myself." He stated that he lived alone, operated a ham radio, and walked a "good mile every couple of days" (Exhibit 6F/157). In January 2003, he stated that he was able to perform his activities of daily living (Exhibit 6F/107). In June 2003, he reported that he was a ham radio operator, did stuff over the Internet, and played games on his computer (Exhibit 6F/92-93). In August 2003, he stated that he had recently lost eight pounds and was exercising more. He estimated that he walked from one-half to one mile on a good day (Exhibit 6F/86). Later that month, he reported that he was walking two to three miles per day and losing weight (Exhibit 6F/84). In August 2003, he stated that he was walking between two to four miles each day and that he had a pedometer that recorded the distance he walked. He estimated that he had recently walked as much as two miles without stopping (Exhibit 6F/79-80). In October 2003, he presented to an examination casually dressed and appropriately groomed. He reported that he recently got a car and that he was enjoying driving again. He disclosed that he

> wanted to do volunteer work, but, because a portion of his benefits were due to his being unemployable, he would not be able to volunteer anywhere that required a social security number (Exhibit 6F/76). In April 2004, he stated that he was volunteering with a group of ham radio operators and that he enjoyed doing crossword puzzles every day (Exhibit 6F/62). In June 2004, he complained about not having a portable energy source for his CPAP machine when he went camping (Exhibit 6F/58). In November 2005, he reported that he cared for a dog, prepared meals such as waffles, steak, pork, fish, and pasta four to five times per week, walked, used public transportation, rode a car, went out almost very day, shopped in stores, and managed his money. He stated that he frequently read newspapers, books, and paperbacks, watched television, and used the computer (Exhibit 1E). Later that month, he described that, on a typical day, he got up around 10 AM, fixed breakfast, watched television around noon, played games and searched the web on the computer, watched some more television, took care of his dogs, and fixed a simple dinner or sometimes a complete meal. He stated that he did his laundry and performed the housecleaning (Exhibit 7F/3). In July 2006, he reported traveling to Montana, where he camped and hiked for 10 days at Yellowstone (Exhibit 12F/36, 39).

Tr. 20.

Plaintiff argues the ALJ engaged in the selective extraction of limited portions of the record here to justify his conclusion that he was more functional than alleged. The undersigned disagrees. As clearly can be seen, the ALJ provided an extensively detailed summary of the evidence in the record in which plaintiff himself reported on his activities of daily living. Indeed, the ALJ's summary accurately describes much, if not all, of the relevant portion of the record containing evidence regarding those activities. See, e.g., Tr. 214, 224, 242, 249-50, 256, 259-60, 264, 266, 270, 273, 279, 286-87, 300, 336-38, 342, 349, 353-55, 358, 360, 365-66, 368, 370-71, 397, 406, 482.

The undersigned further finds that the great majority of the activities the ALJ noted, and again that plaintiff reported, do indicate an ability to function at level greater than that alleged here. For example, the record, as the ALJ noted, shows plaintiff consistently reported walking considerable distances, including at one point up to two to four miles per day. Plaintiff also reported that he baby sat for a neighbor five hours per day, four days a week. In addition, as recent as July 2006, he reported having gone camping and hiking for 10 days. Plaintiff also reported engaging in a number of social activities, household chores, and other activities – such as using the internet and computer and pursuing a ham radio hobby – on a fairly consistent and regular basis. Although not all of the above activities are necessarily indicative of an ability to perform work-related tasks for a substantial part of the day, the majority are.

Plaintiff argues a more balanced picture of his functioning reflects an ability to perform light work with certain postural limitations. But this essentially is the residual functional capacity with which the ALJ

assessed him. See Tr. 19. Indeed, even if it were not, the fact that plaintiff may be capable of performing at a light level of work activity – and he seemingly has admitted this to be the case here – directly belies his allegation of disabling pain and other similarly severe limitations. That is, if plaintiff is capable of working at even a sedentary level of exertional capacity, assuming other vocational factors have been accounted for which do not preclude the ability to work, he cannot be disabled.

Plaintiff further argues he has made numerous visits to the United States Department of Veterans Affairs ("VA"), including more than one such visit in a single day, and given the nature of the VA system and the amount of time it takes to see treatment providers within that system, it would be very difficult to maintain employment given the frequency with which he uses that system. This argument is completely without merit. There is no evidence in the record, other than plaintiff's bare allegations here, concerning the nature of the VA system. Nor is there any evidence that the VA system is the only means of obtaining health care available to plaintiff, or that he is medically required to make so many visits given the lack of evidence in the record discussed below indicating his pain and other symptoms are being experienced at significant, let alone disabling, level. As such, plaintiff's suppositions regarding his potential future health care are entirely speculative and unsupported by the record.

The ALJ also discounted plaintiff's credibility in part because of insufficient evidence in the record establishing "significant functional limitations due to obesity, diabetes, depression, sleep apnea, arthritis of the hips, knee pain, hearing loss, or sinus issues." Tr. 14-18, 21. As noted above, in addition to back problems, plaintiff has alleged disability resulting from diabetes, loss of mobility in his knees, depression, and sleep apnea. A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998). Plaintiff has not specifically challenged this basis for discounting his credibility, nor does the undersigned find it to be erroneous. Indeed, a review of the substantial medical evidence in the record establishes plaintiff does not have significant functional limitations stemming from the impairments noted by the ALJ above and alleged by plaintiff as the basis for his disability claim. See Tr. 129-33, 146, 151-53, 156-57, 203, 206, 210-11, 216-17, 222, 224, 228-29, 232, 239-40, 241-42, 244, 249-50, 256, 258-63, 264-66, 270-71, 281, 286-88, 315, 320, 327, 336-37, 339, 340-45, 348, 350, 353-56, 361, 363, 370-72, 397, 402, 406, 465-66.

Plaintiff points to an abnormal MRI and a report of disc herniations he received. See Tr. 183, 216. But mere evidence of a physical impairment, without accompanying clinical findings indicating functional limitations stemming therefrom, is insufficient to establish disabling pain symptoms. See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993). Plaintiff also refers to a self-report he submitted with his disability application in which he alleges pain so significant that he had trouble putting on his shoes and that he needed help. See Tr. 70 This self-report, however, is contradicted by the substantial evidence in the record discussed below, revealing he experienced significant improvement in his pain on his medications. While plaintiff also may have sought an increase in his medications due to alleged increased pain in early February 2007 (see Tr. 468), again the record overwhelmingly shows he received consistent relief from his medication regimen.

Plaintiff argues as well that he visited the VA's podiatry clinic multiple times for foot care, but once again those records fail to reveal any work-related limitations, significant or otherwise, stemming from his feet. See Tr. 224, 244, 246, 253, 256-57, 277, 315. Plaintiff also points out that he had reported sleeping only a few hours at a time. As discussed above, though, the record fails to show, and the ALJ did not err in finding the absence of, any significant physical or mental functional limitations stemming from plaintiff's sleep apnea or other sleep-related problems. Plaintiff further selectively points to his own self-reports in which he alleged continuing pain and limitations despite the pain medications he was taking, but once more the substantial evidence in the record does show sufficient pain control.

Finally, plaintiff notes that he reported experiencing drowsiness and mental confusion when taking his pain medication (Tr. 88), and that he reported having dizziness, which he states his physician attributed to the medications (Tr. 459). On this issue, the ALJ found as follows:

> Despite the claimant testifying that he had significant side-effects from his medications, the record documents few complaints of side-effects. For instance, he complained of increased visual dreams due to zyban in April 2001, but had no subsequent complaints after it was discontinued (Exhibit 6F/174). In August 2003, he complained of erectile dysfunction secondary to antidepressant medications, but denied any significant side-effects due to methadone (Exhibit 6F/84, 86). Although he complained of dizziness because of medications in August 2006, subsequent medical records from September 2006 through May 2007 document no further complaints of dizziness (Exhibit 12F/19-34).

Tr. 22. The undersigned further notes that in regard to plaintiff's report of dizziness, the treatment provider to whom he made that report merely wrote "[d]izziness reportedly due to medications," but did not herself

1 attribute the alleged dizziness to his medications. Tr. 459. The record also supports the ALJ's statement that there are no further complaints of dizziness in the record or any indication therein that plaintiff ever reported drowsiness or mental confusion to any of his treatment providers.

As discussed above, the ALJ discounted plaintiff's credibility in part because the evidence in the record indicated his "back pain was adequately controlled with medications." Tr. 21-22. Once more, the undersigned finds this to be a valid reason for discounting plaintiff's credibility and to be supported by substantial evidence. See Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999) (ALJ may discount claimant's credibility on basis of medical improvement); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The medical evidence in the record and plaintiff's own self-reports do clearly reveal adequate pain control on medication. See Tr. 222, 224, 228, 249-50, 258-62, 264, 266, 276, 286, 327, 345, 348, 350, 353-54, 356, 360-61, 397, 402, 406, 465.

The ALJ further discounted plaintiff's credibility in part because the treatment he received for his back pain had been "conservative in nature, consisting primarily of pain medications." Tr. 22. This too is a valid basis for discounting plaintiff's credibility. See Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ properly found prescription of physician for conservative treatment only to be suggestive of lower level of pain and functional limitation). In addition, the ALJ correctly noted that while plaintiff presented to several medical examinations with a quad cane in 2000, there is "no documentation of a medical prescription for an assistive device" in the record (Tr. 22), thereby further calling into question plaintiff's allegations of disabling pain and the claimed extent of his physical limitations.

Lastly, the ALJ discounted plaintiff's credibility in part for the following reason:

> Although the claimant alleges being disabled since June 2000, the claimant stopped working for reasons unrelated to his alleged impairments. He testified at the hearing that his previous employer had gone out of business. He also admitted that, if the company had not gone out of business, he would probably have continued working for the company until at least 2004.

Id. This last admission by plaintiff perhaps most of all calls into question his allegations of disability and inability to work. Clearly, the fact that plaintiff expressly felt he was capable of working for some four years after his alleged onset date of disability impugns is credibility, at least for that significant period of time. Accordingly, for all of the foregoing reasons, the undersigned finds the ALJ did not err in finding plaintiff to be not entirely credible here.

IV.  The ALJ Properly Evaluated the VA's Decision

Although a determination by the VA about whether a claimant is disabled is not binding on the Social Security Administration, an ALJ must consider that determination in reaching his or her decision. McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002); 20 C.F.R. § 404.1504. Further, the ALJ "must ordinarily give great weight to a VA determination of disability." McCartey, 298 F.3d at 1076. This is because of "the marked similarity" between the two federal disability programs:

> Both programs serve the same governmental purpose--providing benefits to those unable to work because of a serious disability. Both programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims. . . . Both programs have a detailed regulatory scheme that promotes consistency in adjudication of claims. Both are administered by the federal government, and they share a common incentive to weed out meritless claims. The VA criteria for evaluating disability are very specific and translate easily into SSA's disability framework.

Id. However, "[b]ecause the VA and SSA criteria for determining disability are not identical," the ALJ "may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." Id. (citing Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001). Here, the ALJ did so.

The VA issued a decision dated September 18, 2001, granting plaintiff entitlement to "individual unemployability" effective July 1, 2000, due to an inability "to secure or follow a substantially gainful occupation as a result of service-connected disabilities." Tr. 158-59. The reasons the VA gave in support of this decision read in relevant part:

> . . . On VA exam, Mr. Berry reported that he terminated work in 6-00 for Pony Express when they went bankrupt. . . . Examiner noted that Mr. Berry's main difficulty with unemployment is his pain regime and that potential employers would not tend to hire him due to his inability to pass a drug test due to his pain medications, his abnormal gait and his limitations in lifting because of his service connected back problem.
>
> . . .
>
> The cited evidence shows that although Mr. Berry was terminated due to the company going out of business, he was not able to obtain gainful employment due to pain medication for his service connected disabilities especially for his back. Although the VA examiner cites other non-service connected disabilities as factors for reasons why Mr. Berry would not be able to obtain gainful employment, he opines that it is the pain regime, the abnormal gait and the limitations due to his service connected low back disability which primarily prevents him from obtaining gainful employment.

Tr. 159. In that same decision, the VA also determined that its evaluation of plaintiff's sleep apnea, which

it stated was "currently 50 percent disabling," would continue at the same level, due to his "continued use" of a continuous airway pressure ("CPAP") machine. Tr. 158, 160 ("An evaluation of 50 percent is assigned if a breathing assistance device, such as a . . . CPAP . . . machine, is required.").

The ALJ found as follows with respect to the VA's decision:

> The undersigned discounts the September VA decision. First, as noted above, while a VA assessment is given a significant level of deference, the Social Security Administration is not bound by disability determinations made by other agencies because of different rules governing the definition and assessment of disability. . . . Second, the undersigned gives no weight to the VA's finding that the claimant was unemployable. Whether the claimant could pass a drug test is irrelevant to the determination of disability. The agency's regulations require that a claimant be found not disabled if his residual functional capacity and vocational abilities enable him to work, but he remains unemployed because of the hiring practices of employers. The evaluation of disability is based on the ability to perform jobs in the national economy and not the ability to obtain them . . . Third, the claimant's sleep apnea appears adequately controlled while on the CPAP machine and his back pain appears stable with pain medication. While he has alleged additional impairments, the undersigned finds no evidence that they cause any significant functional limitations.

Tr. 22-23 (internal citations omitted). Plaintiff argues these are untenable grounds on which to reject the VA's decision. First, plaintiff asserts the ALJ erred in stating that he was not bound by the VA's decision due to the different rules governing the definition and assessment of disability in the Social Security context. But this statement is entirely consistent the Ninth Circuit's holding in McCartey that "[b]ecause the VA and SSA criteria for determining disability are not identical," the ALJ "may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." 298 F.3d at 1076; see also 20 C.F.R. § 404.1504.

Plaintiff next argues that while the ALJ considered his obesity, diabetes, sleep apnea, bilateral knee pain, allergic rhinitis, chronic abscesses, bilateral hip pain, hearing loss, and depression separately and then concluded that each of them were non-severe impairments, he failed to consider the combined effects of all of those conditions, whereas the VA did do that in its decision. It is true that the ALJ must "consider the combined effect of all of" a claimant's "impairments without regard to whether any" single "impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. Plaintiff further argues that the combined effects of all of the above conditions do reveal the presence of severe functional limitations, which, he asserts, led the VA to find him unemployable.

Plaintiff, however, has not pointed to any evidence in the record supporting his assertion that the above alleged impairments, either singly or in combination, have resulted in any functional limitations that

have had a significant effect on his work-related capabilities. It should be noted as well that the VA itself, as set forth above, did not base its decision of unemployability on the combined effect of all of the above impairments, but instead relied on plaintiff's alleged inability to pass a drug test due to the medications he was taking, his abnormal gait and his limitations in lifting because of his service connected back problem. As such, the undersigned finds the ALJ did not err here on this basis.

The undersigned further finds the ALJ did provide legally sufficient reasons for rejecting the VA's decision concerning unemployability. First, as discussed above, the ALJ properly determined that the issue of whether or not plaintiff would be able to get or keep a commercial driver's license is not relevant to the determination of disability, even though a state mandated requirement that a commercial motor vehicle driver possess a CDL may not be an actual hiring practice imposed by the driver's employer itself. Second, the ALJ correctly found that plaintiff's sleep apnea appeared to be "adequately controlled" while he was on his CPAP machine (Tr. 23; see also 152-53, 156, 229, 266, 397, 402), and that, also as discussed above, his back pain seemed to be "stable with pain medication" (Tr. 23). Accordingly, the ALJ properly discounted the VA's decision of unemployability.

V. The Hypothetical Question the ALJ Posed to the Vocational Expert Was Not Deficient

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

At the hearing, the ALJ posed a hypothetical question to the vocational expert, which contained substantially the same limitations as the ALJ included in his assessment of plaintiff's residual functional capacity.[8] Tr. 517. In response, the vocational expert testified that he supposed plaintiff's past relevant

---

[8] The ALJ assessed plaintiff with the following residual functional capacity: "[T]he claimant has the . . . capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday. He can occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl, but should never climb

work as a courier driver "would be consistent with the hypothetical" question posed by the ALJ.[9] Tr. 517-20. Plaintiff argues the ALJ erred in relying on the hypothetical question the ALJ posed to conclude that he could return to his past relevant work as a courier driver. Specifically, plaintiff asserts the ALJ relied almost entirely on an assessment of his residual physical functional capacity performed by an evaluator in early November 2005, which was provided nearly two years prior to the hearing, and without the benefit of reviewing subsequent treatment records from the VA. See Tr. 128-35.

This fact, however, does not compromise the validity of that early November 2005 assessment. First, that assessment still was performed well within the period of disability plaintiff is alleging in this case. Second, plaintiff has pointed to nothing specific in the record which occurred after this assessment was performed, which would call into question the legitimacy of the findings contained therein. In addition, as discussed above, the evidence in the record clearly supports the assessment that plaintiff has the residual functional capacity to perform light work, with the additional non-exertional limitations found by the ALJ. Lastly, the undersigned further notes the ALJ provided the following specific reasons for finding plaintiff could perform his past relevant work:

> In December 2005, a disability examiner determined that the claimant had past relevant work as a courier (DOT 230.663-010, light, svp [special vocational preparation] 2[10]). Considering the claimant's residual functional capacity, the disability examiner opined that he could return to his past work as a courier. The undersigned concurs (Exhibit 2E). The undersigned also notes that the claimant admitted at the hearing that, if his employer had not gone bankrupt, he probably would have continued working for the company as a courier until 2004, when he switched his medication from Percocet to methadone. However, as discussed above, the record documents few complaints of side-effects due to medications. The undersigned further points out that, in August 2003, the claimant denied significant side-effects from methadone.

Tr. 23.

As such, it does not appear the ALJ relied on the testimony of the vocational expert to find plaintiff capable of performing his past relevant work. Rather, the ALJ properly based his step four findings on the

---

ladders, ropes, or scaffolds. He should avoid concentrated exposure to vibration and hazards." Tr. 19.

[9]The vocational expert also testified that there were other jobs plaintiff could perform given the same hypothetical question. Tr. 519-20.

[10]SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, Appendix C. An SVP of 2 denotes "[a]nything beyond short demonstration up to and including 1 month," while an SVP of 3 is "[o]ver 1 month up to and including 3 months." Id.

REPORT AND RECOMMENDATION
Page - 17

medical and other evidence in the record, including plaintiff's own admission that he felt he was capable of continuing to perform his past courier driver job long after his alleged onset date of disability. As pointed out by defendant, the ALJ was not required to obtain vocational expert testimony on the issue of whether plaintiff was capable of performing his past relevant work. See Gomez v. Chater, 74 F.3d 967, 971 (9th Cir. 1996). In addition, while the ALJ is bound by the uncontradicted testimony of the vocational expert if one is called, as discussed above, that testimony is not inconsistent with the ALJ's findings here.[11]

Plaintiff next argues the ALJ erred in failing to include in his hypothetical question any effects from his pain medications. As discussed above, though, the substantial evidence in the record clearly reveals the absence of any significant medication-related side effects. Plaintiff points to the additional testimony of the vocational expert that an individual who experienced dizziness, loss of concentration or loss of focus two to three times a day for up to a half hour at a time, would be precluded from engaging in gainful work activity. Tr. 522-23. Again, however, the record fails to support the presence of these symptoms, let alone at the level or frequency just stated. The record also fails to support a finding that plaintiff would miss a couple of days a month of work on a routine basis or would need the kind of breaks he has testified to, which the vocational expert testified would preclude all work activity as well. See Tr. 519. Accordingly, the ALJ did not err in finding plaintiff capable of performing his past relevant work, and thus in determining him to be not disabled at step four of the sequential disability evaluation process.

## CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was not disabled, and should affirm the ALJ's decision.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **February 20,**

---

[11] Plaintiff implies the vocational expert did not really feel the hypothetical question posed, and thus residual functional capacity assessment, to be consistent with his past relevant work because he testified that he supposed the two were consistent. Tr. 520. Although the vocational expert may not have stated his opinion in the strongest terms, there is no indication that he believed an individual with the same residual functional capacity could not perform plaintiff's past relevant work.

1 | **2009**, as noted in the caption.
2 |     DATED this 26th day of January, 2009.

                                                /s/ Karen L. Strombom
                                                Karen L. Strombom
                                                United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 19